UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| IN RE: | ) | CHAPTER 13 |
|---|---|---|
| | ) | |
| DON RICKETTS DOUGHERTY AND | ) | CASE NO. 04-61223 |
| ALISA MICHELLE DOUGHERTY, | ) | |
| | ) | JUDGE RUSS KENDIG |
| Debtors. | ) | |
| | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| | ) | **(NOT INTENDED FOR** |
| | ) | **PUBLICATION)** |

Before the court is Debtors' "Motion to Require Trustee to Refund Overpayment" filed on February 28, 2007. A hearing on the motion was held on March 21, 2007. Donald R. Little, counsel for Debtors, and Robert P. Harbert, counsel for chapter 13 trustee Toby L. Rosen ("Trustee"), appeared at the hearing. Following the hearing, the court established a briefing schedule. At issue is whether Trustee overpaid unsecured creditors and therefore owes a refund to Debtors. Both parties filed briefs in support of their respective positions.

The court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1334 and the general order of reference entered in this district on July 16, 1984. Venue in this district and division is proper pursuant to 28 U.S.C. § 1409. The main complaint is a core proceeding pursuant to 28 U.S.C. § 157. The following constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

## FACTS[1]

Debtors filed their chapter 13 petition on March 16, 2004. Debtors listed $16,101.00 in unsecured claims, not including a disputed claim to Canton School Employees Credit Union in the amount of $5,629.00.[2] On August 26, 2004, Debtors first amended plan was confirmed by the court. The confirmed plan contained the following provision:

---

[1] The parties entered into a joint stipulation of fact on May 2, 2007. These facts are hereby adopted by the court in their entirety. The court will set out a factual history based on the stipulation, as well as other facts in the record, for clarity.

[2] Canton School Employees Credit Union did not file a proof of claim.

> The trustee shall pay the amounts specified in Section E
> of this Plan in the following order of priority: (1) trustee's
> authorized percentage fee; (2) priority claims of the debtor's
> attorney, in the amounts allowed; (3) secured claims paid in
> fixed monthly installments (pro rata in the event of an insuf-
> ficiency); and the following items pro rata: (4) secured claims
> not paid in fixed installments; (5) priority claims other than
> those of the debtor's attorney; (6) specifically classified non-
> priority unsecured claims; and (7) general unsecured claims.

Additionally, the terms of the confirmed plan provided for Trustee to pay:

1. A ten percent (10%) dividend to unsecured creditors;

2. Post-petition mortgage payments of $757.29 per month;

3. Estimated prepetition mortgage arrears of $3,600.00;

4. The loan on a 2002 Kia automobile in the amount of $7,500.00 at 8% interest; and

5. $1,250 in attorney's fees to Debtors' counsel;

To fund the plan, Debtors were to submit $350.00 per week to the trustee for thirty-six months. Debtors modified their plan in November 2004 to increase the percentage paid to unsecured creditors to twenty percent (20%).

General unsecured claims filed in the case totaled $14,128.66.[3] The mortgage arrearage claim amount was $6,661.37, significantly higher than estimated. During the course of the plan, Debtors received a lump sum Social Security disability award. $13,000 of the award was used to pay off the second mortgage liability; $4,100.00 was paid into the plan as disposable income and applied to the plan.

Following the bar date, Trustee projected Debtors' disposable income and determined, based on the claims filed, unsecured creditors would receive 64%. In making this calculation, Trustee simply multiplied payments of $350.00 per week for the length of the plan and subtracted the amounts needed to pay all claims other than those held by general unsecured creditors. The amount remaining, the money projected to be available for unsecured creditors, was then divided by the total of the general unsecured claims to arrive at the 64% figure. Trustee modified her internal distribution system to reflect this amount but did not provide notice to either debtors, creditors or parties in interest of the anticipated percentage to be paid to unsecured creditors. This change did not result in a change to debtors' monthly payment, but resulted from the filing of fewer claims than

---

[3] There is a slight discrepancy in the Joint Stipulation of Facts. Paragraph 8 indicates allowed general unsecured claims totaled $14,128.66; Paragraph 12 states that unsecured creditors filed general unsecured claims totaled $14,012.31. The difference is not material to the issue before the court.

scheduled by debtors in their petition.

In accordance with the plan, Trustee made prorata distributions on the 2002 Kia, the prepetition arrearage claim, and on the unsecured claims. The unsecured distribution was based on the 64% dividend anticipated by Trustee.

In September 2006, as a result of illness precipitating a loss of income, Debtors modified their plan to reduce their payments to $250.00 per week. In October 2006, Debtors' mortgage company increased the monthly postpetition mortgage payment from $757.29 to $908.86. Subsequently, Trustee was forced to discontinue distributions on the unsecured claims. At that point, unsecured creditors had received a 43.4% dividend.

On April 5, 2007, a principal balance of $1,586.06 remained on the secured portion of the automobile loan, and a balance of $1,230.24 remained on the mortgage arrearage claim. It is now impossible for Debtors to complete the plan in the original term.

## PARTIES' ARGUMENTS

Debtors contend that if the unsecured creditors had not received a distribution in excess of 20%, the plan would be complete because the "overpayment" would have been paid to the secured claims. They seek a refund of the difference between the 20% distribution set forth in the modification and the 43.4% actually distributed, as well as the trustee's compensation paid on the alleged overpayment. Debtors want to use the refund to pay the remaining balances on the auto loan and the mortgage arrearage claim in order to complete their payments and receive a discharge.

It is Debtors' position that when Trustee changed the unsecured percentage to 64% in her distribution software, the plan was modified. Debtors argue that Trustee failed to follow the modification procedures set forth in the bankruptcy code and rules and therefore should refund the overpayment.

Trustee objects to the motion for a refund, claiming that she distributed Debtors' payments in accordance with the plan and that Debtors are not entitled to a refund. Trustee classifies the confirmed plan as a "pot" plan, not a percentage plan, and argues that the percentage in the form plan merely establishes the minimum percentage to be distributed, not the maximum. With a pot plan, Trustee argues that the pot, and the amount of the allowed general unsecured claims, determine the actual percentage. In this case, the minimum was 20%. The prorata distribution system resulted in a 43.4% distribution which is within the parameters of the confirmed plan.

Debtors counter and assert that the plan is a percentage plan and should have been paid accordingly. They maintain that no due process was accorded them by Trustee's alleged unilateral modification of the plan.

## LAW AND ANALYSIS

First, the court will determine if Debtors' plan was a percentage plan or a pot plan. As defined by the Bankruptcy Court for the Northern District of Illinois:

> [a] percentage plan designates what percentage of its claim
> each general unsecured creditor will receive without stating
> an exact dollar amount the debtor must pay into the plan until
> all claims are approved. In re Witkowski, 16 F.3d 739, 741
> (7th Cir. 1994). A pot plan, on the other hand, fixes the amount
> debtor must pay into the plan, leaving in question the percen-
> tage each general unsecured creditor will receive in payment
> of its claim until all claims are approved. Id.

In re Golek, 308 B.R. 332, 335 (Bankr. N.D. Ill. 2004).

As both parties recognize, the court employs a standard chapter 13 plan.[4] This plan provides:

> **General unsecured claims (GUCs).** All allowed nonpriority
> unsecured claims, not specifically classified, including unsecured
> deficiency claims under 11 U.S.C. § 506(a), shall be paid, pro
> rata, to the fullest extent possible, but not less than ____% of
> the allowed amount.

Chapter 13 Form Plan, ¶ E9.

Although the plan uses a percentage as a baseline, it is not a percentage plan. At the time the plan is confirmed, the amount to be paid into the plan is fixed. In this case, Debtors were to pay $350.00 per week for thirty-six months, resulting in a pot of $54,600. At confirmation, the plan was a ten percent (10%) plan, meaning the general unsecured creditors were entitled to receive a minimum of ten percent (10%). Following debtors' modification, the minimum percentage was increased to twenty percent (20%). The language of the form plan clearly and plainly provides that unsecured creditors will not receive less than this percent. The fact that the amount received by unsecured creditors can vary based on the amount of allowed unsecured claims is what makes this a pot plan.

Next, the court will consider the implications the determination that the form plan is a pot plan has on the present conflict. The central question is whether Trustee's payment of more than the 20% is a modification of the plan. Contrary to Debtors' position, the court finds that Trustee's use of the 64% figure is not a modification of the plan. Because this is a pot plan, and the percentage used in the plan is only a baseline percentage, the court concludes that Trustee's distribution of an amount in excess of twenty percent did not modify the terms of the confirmed plan. The plan was a commitment to pay a certain amount, disposable income, not a certain percentage. When fewer creditors filed claims, it did not decrease the amount Debtors were required to pay. Debtors were still required to pay their disposable income. It meant that this amount was divided among fewer creditors and, thus, each received more. Consequently, Debtors arguments regarding due process in the plan modification process are irrelevant.

---

[4] The Chapter 13 Form Plan was adopted into practice through Administrative Order 03-08, dated November 19, 2003, which incorporated Administrative Order 02-12.

Trustee's actions in setting the percentage to 64% did exactly what the Golek court explained a pot plan would do: left the unsecured creditors' percentage open until all claims were approved. Once claims were approved, Trustee could determine the percentage. At that point, because fewer claims were filed than anticipated, the payments directed to the plan, the pot, was sufficient to pay unsecured creditors 64%. If all claims had been filed, the percentage would have been lower. The baseline is merely an estimate that assumes all creditors file claims. The Debtors' obligation is to pay all disposable income regardless.

It is also worth noting that Debtors' percentage was not born out by their own plan. Debtors scheduled $16,101.00 in unsecured claims, as well as a $5,629.00 disputed unsecured claim, for a total of $21,730.00. At first, Debtors proposed paying a baseline of 10%, which would have been $2,173.00. They increased the baseline to 20%, or $4,346.00, with a modification. As stated in paragraph 14 of the joint stipulation of facts, and further explained in footnote five below, the available portion of the pot for unsecured claims was at least $8,000.00. Thus, Debtors' baseline should have been approximately 37% ($8,000.00 (pot) ÷ $21,730.00 (scheduled unsecured claims)). If the disputed claim is not calculated, the baseline percentage should have been approximately 50% ($8,000.00 ÷ $16,101.00). Debtors' plan did not accurately represent the anticipated dividend based on the perceived pot of money payable to unsecured creditors and the alleged "overpayment" is not nearly as large as alleged.

Trustee's forward-looking calculations, and resulting change in the percentage, did not modify the pot. Instead, it merely affected the distribution. At the time of the calculation, the plan would have completed within the anticipated term. The problem was unforeseen intervening facts resulted in a shortfall.

When the trustee determined how to distribute the payments, she accounted for the trustee's fee, priority claims of the debtors' attorney, and secured claims paid in fixed installments (e.g. on-going monthly mortgage payments). Then, in accordance with the form plan, she provided for monthly prorata payments on the remaining claims (i.e. secured claims not paid in fixed monthly installments, the remaining priority claims, and specially classified nonpriority unsecured claims, and general unsecured claims). *See* Chapter 13 Form Plan, ¶ F. Presuming the plan is fully funded each month, the monthly prorata distribution is approximately equal to 1/36 of the pot available for each group of claims.[5] When Debtors' were forced to reduce their payments in September 2006, the

---

[5] In this case, figures approximating the amounts in this plan may help in understanding the distribution. Although not exact, the figures will provide a better understanding of this case. Debtors monthly payments were approximately $1,517.00 per month. After deducting an 8% Trustee commission ($121.36) and a monthly mortgage payment of $757.29, $638.35 remained for the prorata distribution between the auto claim, arrearage claim and unsecured claims. In order to pay the auto and arrearage claims, trustee had to calculate the total amount to be paid on the claim over the life of the plan and then divide it by the term (36 months). The auto claim was $7,500 plus interest, resulting in an approximate monthly payment of $225.00; the arrearage claim was $6,661.37, resulting in a $185.04 monthly payment. Thus, $228.31 remained for unsecured creditors each

prorata distribution decreased.[6] Then, in October 2006, when Debtors' mortgage payment increased to $908.86, Trustee basically only had sufficient funds to make the on-going mortgage payment with a small amount remaining.[7] According to the joint stipulation of facts, Trustee discontinued distributions on the unsecured claims in November 2006.

Upon review of Trustee's calculations, and the payments made in this plan, the court finds that Trustee distributed the plan payments in accordance with the confirmed plan and the form plan instructions utilized in this court. The problem in this case does not arise from Trustee's distributions, but from problems encountered by Debtors postpetition. This is not a situation involving fault, but the unfortunate outcome of unforeseen events.

The prorata distribution set forth in the form plan was designed to discourage conversion to Chapter 7 following payment of secured claims. If unsecured claims are not receiving a prorata distributions, the claims pay out slower. This is sometimes also true of percentage plans.[8] In the court's experience, once the car claim or house arrearage was cured, debtors would convert to chapter 7, leaving the unsecured creditors with nominal payments. Although Debtors would have fared better under another system, it doesn't mean the current system is flawed.

Debtors rely heavily on the case of In re Jafary, 333 B.R. 680 (Bankr. S.D.N.Y. 2005). For the reasons that follow, the court finds Jafary to be of no persuasive value.

---

month. $228.31 multiplied by the term of the plan is $8,219.16, which is the pot of money available to general unsecured creditors.

[6] At this point, Trustee was receiving $1,083.33 per month. Deducting the Trustee commission ($86.67) and the monthly mortgage payment ($757.29) left $239.37 for the prorata distribution between the auto claim, the arrearage claim and the unsecured claims. Clearly, this significantly impacted the prorata distribution, resulting in $400.00 less per month for these creditors.

[7] Although Debtors' were still submitting $1,083.33, after Trustee's commission was deducted, $996.66 remained for creditors. After paying the mortgage of $908.86, $87.80 remained for prorata distribution on the auto claim, the arrearage claim, and the unsecured creditors.

[8] In this case, the following would have resulted from a percentage plan. If unsecured claims totaled $14,128.66, a 20% plan would have paid unsecured claimants $2,825.73 over the life of the plan, requiring roughly $78.49 per month. As set forth in footnote 5, if Trustee had $638.35 per month after the commission and on-going mortgage payment was paid, $559.86 would have been available for the auto claim and the arrearage claim, so these claims would have shared an approximate additional distribution of $150.00 per month. Obviously, the auto claim and arrearage claim would have been paid earlier. In this case, because of Debtors' change in circumstances, this plan would have resulted in a more favorable outcome to them – at the detriment of their unsecured creditors.

In Jafary, following certification that the plan payments were complete and following discharge of the debtor, the chapter 13 trustee received a payment from debtor's mortgage company. During the plan, debtor refinanced his mortgage and paid off his chapter 13 plan with the proceeds. Since the mortgage arrearage claim was included in the chapter 13 plan, when the proceeds of the new loan were disbursed, the mortgage company received a double reimbursement for the arrearage: once through the payoff of the mortgage and once through the payoff of the chapter 13 plan. The monies sent to the trustee were the refund of the overpayment. The trustee distributed the money to unsecured creditors and debtor objected.

According to the court in Jafary, *res judicata* attaches to the confirmation order and the only way a trustee can alter the payment a creditor is entitled to receive is through a modification of the plan. Id. at 684 (citations omitted). However, the court distinguishes Jafary because the Jafary court did not address the issue before this court. In Jafary, the issue was whether the trustee could unilaterally increase the amount of the pot:

> in order to increase the amount paid by the Debtor into a pot plan (as opposed to increasing the percentage paid to unsecured creditors from the fixed pot of money established by the plan) the Trustee was required by 11 U.S.C. § 1329)a) to bring a motion to modify the Debtor's confirmed Chapter 13 plan.

Id. at 684 (footnote omitted). The text of the omitted footnote four further supports Debtors' misreliance on Jafary: "[t]he Court does not decide herein whether the Trustee must file a § 1329(a) motion to increase the dividend to unsecured creditors based upon fewer than anticipated filed claims." In the present case, Trustee did not increase the pot, so the issue is separate from that raised in Jafary. Further, the issue which is presented in this case is the issue the Jafary court specifically said it was *not* deciding. Therefore, Debtors reliance on Jafary is misplaced.

## **CONCLUSION**

Debtors' confirmed chapter 13 plan was a pot plan composed of Debtors' disposable income. Through forward-looking projections, Trustee was able to determine the amount of money in the pot. However, the actual percentage could only be determined when the amount of allowed unsecured claims was known. The percentage utilized in the form plan established the minimum which would be paid on general unsecured claims, but clearly left open the possibility for a higher percentage to be paid if fewer claims were filed. When the unsecured claims were lower than projected, fewer creditors shared in the pot of money, resulting in an increased percentage distribution on each claim, although the amount distributed remained steady. Simply, Trustee did not alter the amount of the pot, did distribute the money in accordance with the confirmed plan, and therefore has not undertaken any action requiring the refund of monies.

An order in accordance with this opinion shall be entered immediately.

/s/ Russ Kendig

---
RUSS KENDIG
U.S. BANKRUPTCY JUDGE

Service List:    SEP 2 8 2007

Donald R. Little
1400 N. Market Ave.
Canton, OH 44714

Toby L. Rosen
Charter One Bank Building, 4th Floor
400 W. Tuscarawas St.
Canton, OH 44702